## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-CV-62779-RUIZ/STRAUSS

**RALSTON G. DAVIS**,

>    Petitioner,

v.

**FLORIDA DEPARTMENT OF
CORRECTIONS**,

>    Respondent.

_____/

### REPORT AND RECOMMENDATION

**THIS CAUSE** is before me on Ralston G. Davis' ("Petitioner's") Petition Under 28 U.S.C.

§ 2254 for Writ of Habeas Corpus by a Person in State Custody (DE 1) and Memorandum of Law

in Support of Petition Filed Under 28 U.S.C. § 2254 (DE 1-2) (collectively, the "Petition").

Specifically, Petitioner challenges his conviction and sentence for three counts of first-degree

murder on grounds of constitutional error and ineffective assistance of trial counsel.  (DE 1; DE 1-

2).  This matter has been referred to me to take all action as required by law pursuant to 28 U.S.C.

§ 636(b)(1)(A) and the Magistrate Rules of the Local Rules of the United States District Court for

the Southern District of Florida.  (DE 20).  I have carefully reviewed the Petition (DE 1; DE 1-2),

the Response (DE 13; DE 14), the Reply (DE 19), and the record.  Being otherwise duly informed,

for the reasons further described below, I respectfully **RECOMMEND** that the Petition be

**DENIED.**

## I.   <u>FACTUAL BACKGROUND</u>

Petitioner reported being incarcerated at Tomoka Correctional Institution in Daytona Beach, Florida when he filed his Petition on November 7, 2019.  (DE 1; DE 1-2).  According to the summary of facts in Respondent's Response, on November 30, 2005, Petitioner purchased a semi-automatic AR-15 .223 caliber assault rifle and two magazines from Randy Reddick for $900.00.  (DE 13 at 6) (citing DE 15-2 at 113-15, 131-32).[1]  Reddick had known Petitioner for about three years and often saw Petitioner around the neighborhood; he thought Petitioner was a nice person.  (DE 15-2 at 127-128).  During the sale, and again the next afternoon to evening, Reddick saw Petitioner acting calm and collected.  (*Id.* at 119-20, 128-29, 132).  Between 10:00 and 10:15 p.m. on December 2, 2005, Jerry Nicholson, who was working his barbeque stand by the Exxon Station at the intersection of Sunrise Boulevard and 31st Avenue, saw someone stopped in the intersection despite having a green light.  (*Id.* at 359-60).  The driver jumped out of the car, got on top of the car, and started shooting in the air.  (*Id.* at 360-62).  Although Nicholson could not identify the shooter, police found total of nine shell casings in the intersection that were later identified as having been fired from Petitioner's gun.  (*Id.* at 348-51, 383-88).  Farrah Cyprien and Labrent Gray, who were both working at the barbeque stand, and John Diggs, who was watching television and drinking beer in his truck at the station, also heard these shots.  (*Id.* at 231, 235, 370,

---

[1] DE 15-2 is a 1,743-page portion of the record, consisting of trial transcripts.  The transcripts have page numbers (appearing in the top righthand corner of the page) that appear to continue from other parts of the record.  As such, page 1 of DE 15-2 shows "Page 768" in the upper right hand corner.  At times, the parties' briefs appear to cite to the page number within the transcript or of the overall record rather than the page number of the pdf document filed on this Court's docket as an exhibit.  Throughout this Report and Recommendation, when I cite to DE 15-2, I cite to the page number *of DE 15-2*, rather than citing to the transcript's internal page number.

738-40). Police from several agencies responded to multiple reports of shots fired near the intersection, but the shooter was gone before their arrival. (*Id.* at 81-82, 272, 452-53).

Earlier that same evening, Myosha Proby had dinner and watched a movie in her apartment with Hermione Harrell. (*Id.* at 149-50). After the movie, Harrell started to take a shower to get ready to go out to a club with another friend, and Proby asked Harrell for her phone to call Petitioner. (*Id.* at 150-51). Harrell had gone out on a date with Petitioner a couple of months before. (*Id.* at 147). She introduced Proby to Petitioner the same night, when Proby wanted to buy cocaine. Harrell knew Petitioner sold cocaine but never saw him use it. (*Id.* at 147-48, 167-69).[2] When Harrell got out of the shower, she saw that Proby was upset. (*Id.* at 151). Proby told Harrell that Petitioner was upset, and Harrell listened to Petitioner on the phone yelling and "fussing" at someone else. (*Id.* at 151). Harrell heard Petitioner say "come out" to someone. (*Id.* at 150-51). As Harrell was watching, Proby mouthed the words Petitioner was saying to her on the phone. (*Id*. at 153). Proby relayed to Harrell that Petitioner told her he was going to come and kill her. (*Id.*). Harrell suggested Proby call the police, but the evidence does not indicate that Proby did. (*Id.* at 152.). Harrell tried to call Petitioner and sent a text to Petitioner for him to call her. (*Id.* at 153.) Petitioner did not answer the call or reply to the text. (*Id.*). Instead, he arrived at the apartment about fifteen (15) minutes later. (*Id.* at 153-54).

Jason Rolle observed Petitioner arrive at Proby's apartment complex. (*Id.* at 142). Petitioner stopped his car near the entrance to the building, came up behind Rolle, and then walked past him to a second-floor apartment. (*Id.* at 142-44). Rolle saw that Petitioner was bleeding from the nose and mouth as though he had been in a fight. (*Id*. at 137-139). Petitioner climbed the stairs

---

[2] Petitioner told a psychologist that his primary source of income was selling drugs and that Ms. Proby was a customer. (DE 15-2 at 593).

with his rifle, one clip inserted and an extra clip in hand, and looked serious, angry, and totally focused as he walked.  (*Id*. at 144-145).  At the apartment door, Petitioner cocked the rifle before he banged on the door.  (*Id.* at 137).  When Rolle saw that, he immediately went back downstairs. (*Id.*).  Minutes later, Rolle heard gunshots.  (*Id.* at 138).

Harrell heard someone knocking on the door about fifteen (15) minutes after Proby finished her phone call with Petitioner.  (*Id.* at 154, 171).  When Proby opened the door, Harrell saw Petitioner in the open doorway, carrying a rifle at his side and dressed in all black.  (*Id.* at 154, 171-72).  From the look of his eyes, it appeared as though he had been smoking or drinking; he also had a slight stagger and was unsteady on his feet when he came in.  (*Id*. at 156).

Once inside the apartment, Petitioner started yelling, "You set me up, you set me up." Proby kept saying "that wasn't my brother"; Petitioner responded that he knew and continued accusing her of setting him up.  (*Id.* at 155-156).  Next, Petitioner ordered Proby to "get the f*** down."  (*Id.* at 157).  When Proby got on her knees and folded her arms with her back turned to Petitioner, Petitioner started shooting.  (*Id.*).  As Petitioner shot her, Proby collapsed to the floor near the coffee table.  (*Id.* at 158).  Petitioner went around the table and got on top of it as he continued to shoot her over twenty (20) times.  (*Id.* at 174).  Although Petitioner never paid attention to Harrell, she got up during the shooting and jumped from the second-floor balcony, and hid in the laundry room until the police arrived.  (*Id.* at 158-59, 174-75).

About twenty to thirty minutes after the initial shooting, multiple witnesses observed Petitioner return to the intersection of Sunrise Boulevard and 31st Avenue, pull into the Exxon station lot, and jump out of the car with a rifle.  (*Id.* at 363-65, 371-73, 519, 742-43).  Petitioner was playing loud music in his car.  (*Id.* at 506).  Petitioner approached Ravindra Basdeo as Basdeo sat in his car and shot him.  (*Id.* at 516-19).  Petitioner was angry and was shouting and cursing at

Basdeo.  (*Id.* at 288-90; 507-08; 519).  Cyprien testified to hearing "tapping sounds" while in the BBQ truck and saw Petitioner standing at the window of the car that Basdeo was driving.  (*Id.* at 229-234).  Other customers told Cyprien that there was shooting, so Cyprien exited the BBQ truck. (*Id.*).  When Cyprien returned to the front of the truck, she saw that Basdeo was dead in the car. (*Id.*).

Petitioner later told his parents that Basdeo cut him off so he "follow[ed] him in a gas station; [he] ma[d]e him open his mouth," and he murdered him.  (*Id.* at 1059-1060).  A psychologist testified that Petitioner told him that he followed Basdeo to the gas station, put his rifle into Basdeo's mouth and pulled the trigger, killing him.  (*Id.* at 585, 416-17, 426, 571, 592).

Petitioner then turned around toward Diggs in his truck, approached, and started talking to Diggs.  (*Id.* at 743-44).  Petitioner told Diggs that "somebody played him out" or "done him wrong."  (*Id.* at 743-44).  Diggs knew Petitioner because Diggs accompanied the mother of a victim to a trial where Petitioner appeared as an eye-witness.  (*Id.* at 757-58).  Petitioner turned his attention away from Diggs when Carlos Jones walked out of the convenience store.  (*Id.* at 744).

Jones's girlfriend, Jennifer Josephson, testified that Jones had entered the Exxon convenience store to purchase snacks for a movie.  (*Id.* at 255-56).  Just as Petitioner approached Diggs' truck, Jones came out of the convenience store, and Petitioner grabbed him.  (*Id.* at 744-45).  Petitioner told Jones, "Don't run or I'm going to kill you."  (*Id.* at 744).  Ruben Hamm testified that he saw two people outside the convenience store – one dark-skinned and one light-skinned and one with a black rifle and one with a shopping bag.  (*Id.* at 726, 729-34).  Hamm walked out of the way when he saw the rifle but heard gunshot noises and then saw someone on the ground.  (*Id.*).  Diggs testified that Petitioner put his left arm around Jones' neck and shoulder and walked Jones back toward the store.  (*Id.* at 745).  Petitioner told Jones to get down or

Petitioner would kill him.  (*Id.*).  Jones was cooperative and got to his knees.  (*Id.* at 746).  Once Jones was on his knees, Petitioner shot him multiple times and walked casually back to his car as sirens were heard indicating that police were arriving.  (*Id.* at 511-12, 514-15, 520, 746, 755-57).[3]

After Petitioner threw the gun into his car, he took off fast.  (*Id.* at 748-50).  Petitioner passed the police cruisers as they were entering the Exxon station.  (*Id.* at 513, 520, 749-50).  People reported to law enforcement that they observed Petitioner hold his rifle out of his driver's side window when he drove through the Sunrise Boulevard and 31st Avenue intersection going east; pursuing police officers later observed the same thing.  (*Id.* at 283-84, 452-54, 838).  Officer Hagerty, while riding with her Partner, Officer Jenkins, saw Petitioner sticking his upper body outside the window.  (*Id.* at 468-69, 836).  At one point, Petitioner drove his car into a strip mall parking lot; but, as the police cruisers followed him in, he made a U-turn and drove his car at Officer Jenkins' vehicle, forcing Officer Jenkins to put the cruiser in reverse to avoid a collision.  (*Id.* at 455; 839).  Petitioner stopped his vehicle about ten (10) feet away from the police cruiser and got out of his car.  (*Id.* at 455-56).  Petitioner was observed bleeding from the mouth.  (*Id.* at 839).  Officers drew their weapons and ordered Petitioner to the ground.  (*Id.* at 456).  Petitioner looked at Officer Hagerty, who was wearing diamond stud earrings, and yelled in an angry tone and demeanor, "I ain't got my f***ing diamond earrings on."  (*Id.* at 456-57, 471-72, 840, 848-51).  Ignoring commands given by the police, who had their weapons drawn, Petitioner got back

---

[3] A great deal of forensic, blood, DNA, and ballistic evidence was recovered from the two crime scenes – Proby's apartment and the Exxon station – as well as from Petitioner's car and clothes. (DE 15-2 at 695-702).  A ballistics expert determined that thirty-nine (39) of the forty (40) bullet casings recovered were fired from Petitioner's AR-15 rifle; the remaining casing lacked sufficient characteristics to draw a conclusion.  (DE 15-2 at 378-380, 387-88).  Petitioner stipulated at trial that DNA evidence revealed that material swabbed from the rifle muzzle matched Basdeo's DNA and swabs/cuttings from the rifle, Petitioner's gloves, pants, and shirt matched Proby's DNA.  (*Id.* at 697-702).  A medical examiner conducted the autopsies on Jones, Basdeo, and Proby and determined all three deaths were homicides.  (*Id.* at 409, 412, 425-27).

in his car and fled west on Sunrise again with the police in pursuit.  (*Id.* at 472-73).  During the chase, Petitioner drove very aggressively, weaving in and out of traffic, driving up on the sidewalk, and running a red light.  (*Id.* at 852-53).

Petitioner abruptly stopped his car when he reached the Florida Turnpike entrance at Sunrise.  (*Id.* at 83-84, 93-94, 768).  Petitioner opened the car door and threw his keys out the window but remained inside his vehicle.  (*Id.* at 459).  With weapons drawn, the police shouted orders to Petitioner.  (*Id.* at 459).  Following a struggle, they pulled Petitioner from his car.  (*Id.* at 93-94, 458-60, 473-74, 482-84, 767-70, 776-77, 840-43).  Petitioner's behavior was erratic, shifting between a somewhat compliant and quiet state and a very angry, combative, and violent state.  (*Id.* at 83).  He was flailing his whole body, screaming and yelling and kicking his legs.  (*Id.* at 455, 770).  Both hand and leg restraints had to be used, and Petitioner was tasered seven times before he could be subdued.  (*Id.* at 85-86, 462, 487-89, 770-74, 781-82).  Officer Michael Connor heard Petitioner state during his arrest, "Hand me my AR-15 and a bullet and I will kill you all" and "Stand in front of me and I'll put a bullet in your face."  (*Id.* at 877).  Officer Hagerty heard Petitioner curse and say, "Give me another bullet, B****, I'll put it between your eyes."  (*Id.* at 462-63). Hagerty testified Petitioner's behavior was consistent with someone on cocaine, PCP, or Ecstasy but might also be consistent with being mentally ill.  (*Id.* at 474).  Officers Bigwood and Bellerose also testified that based on their experience, Petitioner's behavior was consistent with being under the influence of a narcotic but that the behavior might also be consistent with being mentally ill.  (*Id.* at 86-87, 863-64, 869).  While Petitioner was restrained following his arrest, Officer Wilson heard him repeatedly make comments such as "I am God" and "Jesus is great" and thought it was not normal.  (*Id.* at 786-88).  Officer Connor also heard Petitioner make comments about Jesus, how he was directed to do what he had done, he would be forgiven, and other

statements with religious overtones, which Officer Connor found irrational under the circumstances.  (*Id.* at 876, 881-84).  However, neither Officers Hagerty nor Jenkins heard Petitioner pray, recite prayer words, or refer to God during the arrest.  (*Id.* at 462, 842).  Police found white wafers inside a plastic baggie in the ashtray of Petitioner's car; the wafers were later determined to be rock cocaine.  (*Id.* at 709-10, 916-17).

Following his arrest, Petitioner was taken to Plantation General Hospital at approximately 1:08 a.m.  (*Id.* at 877).  Officer Connor followed Petitioner to the hospital and testified that Petitioner just wanted his injuries cleaned but did not want any additional medical treatment.  (*Id.* at 870, 877-81).  Detective Carmody, who had worked in a juvenile mental health institute for six years and had training in psychology before becoming a deputy, was with Petitioner at the hospital.  (*Id.* at 1101, 1115).  Det. Carmody testified that Petitioner adamantly refused to have a needle put in his body.  (*Id.* at 1106).  Petitioner rejected stitching up his wound on his face, having his blood drawn for testing, or any procedures involving injections or puncturing of his skin, but Petitioner agreed to a computed tomography ("CAT") scan.  (*Id.* at 1106-15).  While at the hospital, Petitioner had normal conversations with Det. Carmody for about ten (10) minutes and made eye contact.  (*Id.* at 1107).  They talked about New York because Petitioner was from there originally and thought Det. Carmody was from New York as well. (*Id.* at 1108). Petitioner spoke of his time in the Reserve Officers Training Corps ("ROTC") and of the Rastafarian religion with Halie Selassie, the Lion of Judah.  Petitioner discussed how his diet as a Rastafarian was different from that of a Roman Catholic.  (*Id.*).  At no time did Petitioner appear to Det. Carmody to be hallucinating nor would he drift off when speaking.  (*Id.* at 1110).  Det. Carmody though it was clear that Petitioner knew he was at the hospital.  (*Id.*).  The only statements Det. Carmody noticed as being out of the ordinary were that Petitioner kept calling Det. Carmody "Captain" and that Petitioner mentioned

he was on a mission.  (*Id.* at 1111).  Petitioner did not exhibit any of the mental infirmities that Det. Carmody had observed when he was working with juveniles in the mental health hospital. (*Id.* at 1122).

Petitioner was later taken to the Broward Sheriff's Office ("BSO") headquarters and turned over to detectives around 3:41 a.m.  (*Id.* at 878-79).  Victoria Corcoran was the emergency medical technician at the BSO intake facility when Petitioner arrived.  (*Id.* at 817-18).  She took Petitioner's vital signs, but Petitioner was unresponsive to her questions and would not sign the intake form. (*Id.* at 817-22, 833).  Corcoran checked the "hallucinations" box because Petitioner seemed to be talking to himself, giggling, and would not make eye contact with her.  (*Id.* at 822).  She noted on the form "current bizarre behavior."  (*Id.* at 822-23).  She also noted that Petitioner had been reported to be homicidal by a BSO sergeant, was easily agitated, avoided eye contact, and appeared to hallucinate.  (*Id.* at 824).  Although she did not have a degree in psychology, she assumed Petitioner had some sort of psychological problem.  (*Id.* at 829-30).

At BSO, Petitioner was placed in an interview room around 3:50 a.m.  (DE 15-2 at 932). Detective Ilarraza had set up a video camera to record the events in the interview room.  (*Id.*).  At BSO, the detectives collected Petitioner's clothes and offered him something to drink.  (DE 15-3 at 2-4, 14).  Petitioner was able to provide his personal information when asked for it.  (*Id.* at 15-20).  Petitioner and the two detectives were from Brooklyn, and Petitioner was able to discuss various neighborhoods in Brooklyn.  (*Id.* at 20-22).  The detectives asked Petitioner if he knew who the current President and Vice President are, and he responded correctly.  (*Id.* at 25-26). Petitioner stated he had seven or eight sisters.  (*Id.* at 26).  When asked about the car he was driving, Petitioner stated he bought the car when he had jobs.  (*Id.* at 27-29).  Eventually, Det. Carmody

and Det. Ilarraza began to discuss Petitioner's *Miranda* rights with him.  (*Id*. at 50).  Petitioner

ultimately invoked his rights sometime between 4:35 and 4:40 a.m.  (DE 15-4 at 13, 17).

Petitioner was allowed to visit with his parents in the interview room, during which the

video camera continued recording.  (DE 15-3 at 55).  Petitioner's mother asked Petitioner what

happened, and Petitioner responded, "God put me out there to subtract somebody."  (*Id.* at 58).

Petitioner additionally said, "big sister . . . she betray me, so I murdered her."  (*Id.*).  Petitioner

further explained that he killed because he was "on a mission, just taking care of business."  (*Id.*

at 61).  Petitioner also noted that he had been tasered because he had used cocaine:

> it might be right, that's why they (unintelligible), 'cause *I have cocaine in*
>
> *my system*, [4] that's why they Tase me three times, I mean, I shake it off
>
> like this.

(*Id.* at 74) (emphasis added).

When Petitioner's parents commented on his face, he told them parents that he got into a

fight.  (*Id.* at 63, 89, 100-101).  At one point, he stated that he was beat up but that "everyone that

shot not living anymore."  (*Id.* at 101-102).

A search of Petitioner's car resulted in the seizure of a plastic baggie containing white

wafers.  (*Id.* at 709-11).  The substance was tested by Evelyn Ortiz, a forensic chemistry expert,

---

[4] Defense counsel objected to the State questioning a witness about this part of the recording.
(DE 15-2 at 1236).  Specifically, defense counsel objected that this fact was not in evidence and
that he had interpreted this part of the recording differently.  *Id.*  The witness ultimately responded
to the prosecutor that "I didn't hear it the way you heard it."  *Id.* at 1237.

who determined that it was three grams of cocaine in rock form, commonly known as crack cocaine. (*Id.* at 913, 915-17).

In his defense, Petitioner primarily argued that on December 2, 2005, the date of the incident, he was suffering from a temporary psychotic mental disorder and was legally insane because he did not know that what he did was wrong. (*Id.* 1215-1620). Petitioner's mother, Marcia Davis, testified that Petitioner grew up in a very religious family with five siblings. (*Id.* at 1280-81). Mrs. Davis first noticed Petitioner's behavior change in November 2005 when he became unusually angry and withdrawn after a storm caused a portable basketball hoop to fall onto his car and smashed his windshield. (*Id.* at 1281-82). On November 30, Petitioner brought home a video game that had a curse word in it, which caused him to get into a big argument with his father, and his father kicked him out of the house. (*Id.* at 1283-84). At about 3:00 a.m. on December 1, Mrs. Davis called Petitioner and found out that he was out on the street. (*Id.* at 1285). She told him to return home, which he did. (*Id.*). Mrs. Davis saw Petitioner sleeping at the kitchen table around 6:00 a.m. and told him to go sleep in his bed, which he did. (*Id.* at 1285). Mrs. Davis noticed that Petitioner did not take off his clothes when getting into his bed, which was unusual. (*Id.* at 1285-86). Petitioner woke up around 9:00 a.m. and started talking to Mrs. Davis and his sister Ruth. (*Id.* at 1286). Petitioner spoke about wanting to be a DJ for God and claimed God was talking to him, which was unusual. (*Id.* at 1287-90). Mrs. Davis saw Petitioner in the same black outfit as he had worn the previous day and told him to take a shower and change. (*Id.* at 1290-91). Petitioner replied yes but never did. (*Id.* at 1291). Petitioner then talked to Mrs. Davis about a new girl whom Petitioner referred to as a big sister. (*Id.* at 1292).

On the morning of December 2, Petitioner was wearing the same clothes and had not bathed since November 30. (*Id.* at 1293). Petitioner brought Mrs. Davis roses and talked to her for a

while about the church and the same new girl, who Mrs. Davis later learned was Proby.  (*Id.* at 1294).  Mrs. Davis also noticed that Petitioner was fidgety and kept looking behind himself when they were the only ones in the room.  (*Id.* at 1296).  Mrs. Davis thought Petitioner was really acting different and invited him to pray with her.  (*Id.* at 1296-97).  Petitioner prayed with her and then left to get breakfast at McDonald's.  (*Id.* at 1297).  When Petitioner returned later that night, he was still wearing the same black outfit.  (*Id.* at 1299).  Mrs. Davis never saw Petitioner wear gloves before, but she noticed that he was also wearing black gloves that night.  (*Id.*).  Petitioner called his father a king, and then talked to his father about the importance of starting work early and getting a proper education for a black man.  (*Id.* at 1300).  Petitioner received a phone call during his conversation with his father and told the person he would call back later.  (*Id.* at 1301).  Shortly after resuming his talk with his father, Petitioner got up, claiming that he had to get back to the person who just called.  (*Id.*).  Mrs. Davis asked Petitioner to bathe and change.  (*Id.*). Petitioner said he would do it when he came back and then left.  (*Id.* at 1296-1301).  Petitioner's father was concerned about him and told Mrs. Davis to call Petitioner again after he left.  (*Id.* at 1301-02).  Mrs. Davis called and asked Petitioner to come home as soon as possible and to finish the conversation with his father.  (*Id.* at 1302).  Petitioner said okay.  (*Id.*).  Later that night, two boys came to the house to tell them something was wrong because they saw Petitioner surrounded by police on Sunrise near the Turnpike.  (*Id.* at 1302-03).

Dr. Allan Ribbler, a neuropsychologist, testified that he spoke to Petitioner at the Broward County Main Jail on four occasions for two to three hours at a time in addition to reviewing other medical records, a deposition from at least one deputy, and a video of Petitioner's conversation with his parents following his arrest.  (*Id.* at 522, 529-31).  In his opinion, Petitioner suffered from a brief psychotic disorder with hallucinations on December 2.  (*Id.* at 531).  Dr. Ribbler stated that

Petitioner's specific hallucinations and delusions were that he was hearing the voice of God telling him, among other things, to shoot people.  (*Id.* at 531, 536-37).  Dr. Ribbler agreed that a substance-induced psychotic disorder can be triggered by various drugs, including cocaine, and that it may not resolve itself promptly but could persist for weeks or longer.  (*Id.* at 621-22).  Petitioner, however, denied using cocaine on the night of the crime and stated his drug of choice was marijuana.  (*Id.* at 592-93).  Because there was no blood test showing Petitioner was on cocaine at the time, Dr. Ribbler did not take cocaine use into account in forming his opinion.  (*Id.* at 594).  In addition, Dr. Ribbler gave Petitioner tests that ruled out brain disease or injury and malingering. (*Id.* at 579-80, 585).  Dr. Ribbler concluded that Petitioner knew he was shooting a gun and killing people but that Petitioner did not believe his acts were wrong; in fact, he concluded that Petitioner believed he was doing right.  (*Id.* at 547, 582).  Therefore, his opinion was that Petitioner was legally insane on December 2, the night of the crime.  (*Id.* at 582-83).

Dr. Abbey Strauss, a psychiatrist, who interviewed Petitioner twice and reviewed Petitioner's records, including the recording of his meeting at BSO with his parents, opined that Petitioner was psychotic.  (*Id.* at 1134, 1144-45).  Dr. Strauss did not test Petitioner but relied on the tests of others.  (*Id.* at 1218).  Dr. Strauss testified that Petitioner appeared normal until his parents started seeing shifts in their son's behavior before the crimes. (*Id.* at 1146-52).  Dr. Strauss concluded that Petitioner had suffered a brief psychotic disorder and explained that Petitioner was able to have cogent conversations at times because psychosis fluctuates allowing for moments of greater and lesser lucidity.  (*Id.* at 1166).  According to Dr. Strauss, Petitioner knew what he was doing on December 2, and he knew the consequences, but just didn't know it was wrong.  (*Id.* at

1187-88).  Dr. Strauss acknowledged that the binge use of cocaine could induce auditory hallucinations and parallel the symptoms seen in psychosis.  (*Id.* at 1232-33).

Dr. Dennis A. Day, a court-appointed psychologist, who reviewed Petitioner's records and spoke with Petitioner, concluded that on December 2 Petitioner was suffering from a brief psychotic disorder.  (*Id.* at 1324, 1327, 1329-31).  Further, Dr. Day testified that the brief psychotic disorder had an associated qualifier or "stressor" because Petitioner was the principal witness in a murder that occurred at his high school.  (*Id.* at 1334).  Additionally, Dr. Day opined that Petitioner knew what he was doing but did not know that what he was doing was wrong.  (*Id.* at 1342).  Dr. Day also agreed that a brief psychotic disorder can last an hour, days, or even a month or more, whereas a drug-induced psychosis would normally only last hours or days.  (*Id.* at 1339-42).  Dr. Day was aware that Petitioner was an admitted drug dealer with regular access to cocaine and that Petitioner refused to give a blood sample, but that did not change his opinion.  (*Id.* at 1345-47, 1359-64).  Dr. Day was unaware that Petitioner had admitted to using ecstasy or that Petitioner looked like he was on drugs at the time he came to Proby's apartment that night.  (*Id.* at 1347-49).

The State presented Dr. Lori Butts, a court-appointed forensic psychologist and attorney, in rebuttal.  (*Id.* at 1380-82).  Dr. Butts concluded Petitioner was not suffering from a mental disease or defect that would have rendered him unable to know the consequences of his behavior or to not know the wrongfulness of his behavior at the time of the crimes.  (*Id.* at 1386).  Dr. Butts explained a two-pronged approach to a sanity evaluation: (1) whether a person suffers from mental disease, defect, or infirmity and (2) whether a person knew the consequences of their actions, or, if they knew the consequences of their actions, whether they knew those actions were wrong.  (*Id.* at 1386-87).  Dr. Butts found the DVD recording of Petitioner's interview after the murder (which included his conversation with his parents) was significant to her diagnosis because it showed

14

Petitioner recounting the events leading up to the crimes at issue soon after those events as compared to his later recounting to other people over the years.  (*Id.* at 1388-89).  Specifically, Dr. Butts described how the video showed the Defendant speaking about vengeance, betrayal, and anger, in contrast to his more rote recounting to the other doctors who had interviewed him later.  (*Id.*).  Dr. Butts found Petitioner was malingering based on jail medical records, Petitioner's girlfriend's notes, a competency evaluation by Dr. Trudy Block-Garfield, psychological testing by Dr. Brannon, the recording of the interaction with his parents following his arrest, and Dr. Butts' interview of Plaintiff.  (*Id.* at 1390).  Dr. Butts noted that: the jail intake records indicated that Petitioner was under the influence of drugs or alcohol (*Id.* at 1391); Petitioner gave inconsistent statements about his past mental health history (*Id.* at 1396-98); and Petitioner seemed to exaggerate his alleged hallucinations in a manner inconsistent with real mental illness.  (*Id.* at 1397-98).  Dr. Butts further emphasized Petitioner's girlfriend's notes of a visit she and Petitioner's mother made on January 9, 2006, wherein the girlfriend thought she saw Petitioner and his mother saying, "stay making them think you crazy."  (*Id.* at 1405).  Dr. Butts also noted that Dr. Block-Garfield tested Petitioner for malingering on April 23, 2006 and concluded that he was malingering.  (*Id.* at 1406-07).  Dr. Butts also identified that Petitioner appeared to be malingering when Dr. Brannon administered psychological testing in January 2006.  (*Id.* at 1408-10).

Furthermore, Dr. Butts found significant the various, ever-changing presentations Petitioner gave for why he was in jail.  (*Id.* at 1395-96).  Petitioner told the jail medical staff that he hears the voice of God but the next day says that he heard voices all his life, which Dr. Butts testified was known not to be true.  (*Id.* at 1396).  According to Dr. Butts, when someone is psychotic, there is consistency within their delusional belief system.  (*Id.* at 1400-01).  However,

with Petitioner, there was a daily shift in his presentation.  (*Id.* at 1401).  As a jail doctor noted, "At times [Petitioner] acts bizarrely in an atypical way, appearing to want to be seen disorganized and mentally ill than he really is."  (*Id.*).

Dr. Butts opined that Petitioner knew that his actions were wrong.  (*Id.* at 1414-22).  She noted that, according to John Diggs and Robert Blue, Petitioner was trying to conceal his rifle (holding it down at his side, next to his leg) when he was at the gas station and sped out of the lot when sirens were heard indicating police were arriving.  (*Id.* at 1416-17).  Dr. Butts also testified that witnesses observed Petitioner evading police, after he was boxed in when he first pulled into the strip mall, by driving his car at the police officers, running a red light, and swerving around cars.  (*Id.* at 1417).  Petitioner told Dr. Butts, however, that he did not know that he was being followed by the police even though he stopped, confronted the police, fled and struggled with police once apprehended.  (*Id.*).  Dr. Butts opined that such conduct indicated that Petitioner knew his behavior was wrong and unlawful.  (*Id.* at 1417-18).  The recording of his conversation with his parents at BSO showed that Petitioner was able to distinguish God's law from society's law, which meant that he knew the difference between the two standards of right and wrong.  (*Id.* at 1421).  Dr. Butts described  Petitioner's answers to her interview questions as seeming scripted and observed that he would respond "I don't know," to more probing questions.  (*Id.* at 1418).  To Dr. Butts, this behavior indicated to her that Petitioner was unsure where to go with his answers because he was unsure of the implications those answers may have on his story.  *Id.*

At the end of the State's case in chief, defense counsel moved for a judgment of acquittal ("JOA") arguing that the State failed to prove that Petitioner was the one who shot the victims. The motion was denied.  (*Id.* at 1131-32).  Counsel renewed the motion for JOA on the same

ground at the end of defense case in chief.  (*Id*. at 1366).  The Court denied the motion stating that the issues before the Court were purely for the jury.  (*Id*. at 1366-67).

## II.   <u>PROCEDURAL HISTORY</u>

Petitioner was charged by indictment with the first-degree murder of Myosha Proby, Ravindra Basdeo, and Carlos Jones on December 22, 2005.  (DE 14-1 at 9-10).  A jury found him guilty as charged in the indictment on July 7, 2009.  (*Id.* at 53-58).  On January 7, 2010, Petitioner was adjudicated guilty and sentenced to death for the murder of Proby and to consecutive terms of life in prison for the murder of Basdeo and Jones.  (*Id.* at 60-69).  On appeal, Petitioner raised ten claims, including (as relevant here) that reversible error occurred when the jury viewed a DVD recording in which Petitioner invoked his right to remain silent and that the trial court erred in denying Petitioner's motion to suppress the recording of Petitioner's post-arrest conversation with his parents.  *See Davis v. State,* 121 So. 3d 462, 480 (Fla. 2013).  The Florida Supreme Court affirmed Petitioner's convictions but ruled Petitioner's death sentence disproportionate on July 3, 2013.  *Id*.  On November 14, 2013, Petitioner was resentenced to life in prison for the murder of Proby.  (DE 14-2 at 136-38).

On July 23, 2014, Petitioner timely filed a motion to vacate or set aside his judgment and sentence pursuant to Florida Rule of Criminal Procedure 3.850, raising six grounds for relief:

(1) trial counsel was ineffective to in preparing and arguing his motion in limine;

(2) counsel filed a boilerplate JOA motion;

(3) counsel failed to retain a DVD expert to provide the jury with a proper analysis regarding communication on the DVD;

(4) counsel failed to move for a proper *Martinez*[5] inquiry into the validity of admitting the DVD transcript;

(5) counsel misadvised him not to testify on his own behalf; and

(6) cumulative error.

(*Id.* at 140-59).

On July 31, 2017, the postconviction court summarily denied all claims except the claim that trial counsel misadvised him not to testify on his own behalf.  (*Id.* at 166-70).  After an evidentiary hearing, the trial court denied that remaining claim on October 29, 2018.  (*Id.* at 172-80).  Petitioner filed a notice of appeal on October 31, 2018.  (*Id.* at 182).  In his initial brief, filed on March 27, 2019, Petitioner argued various errors in the postconviction court's summary denial of his claims.  (*Id.* at 184-227).  The Fourth District Court of Appeal affirmed without opinion. *See Davis v. State*, 277 So. 3d 584 (Fla. 4th DCA 2019).  The mandate was issued on September 13, 2019. (*Id.* at 231).

Petitioner filed the instant petition on November 7, 2019.  (DE 1).  In this petition, Petitioner raises six claims for relief:

(1) A mistakenly-unredacted portion of the DVD recording of the Defendant's post-arrest interactions, available to the jury during deliberations, amounted to an unconstitutional comment on Petitioner's invocation of his right to remain silent;

(2) The state court's finding that there was no constitutional basis to suppress the recording between Petitioner and his parents was contrary to and involved an unreasonable application of clearly established federal law;

[5] *Martinez v. State*, 761 So. 2d 1074 (Fla. 2000).

(3) Trial counsel provided ineffective assistance by failing to prepare, investigate, and argue an effective motion in limine to exclude evidence of cocaine;

(4) Trial counsel provided ineffective assistance by failing to make a particularized request for judgment of acquittal on grounds of insanity;

(5) Trial counsel provided ineffective assistance by failing to move for a proper inquiry pursuant to *Martinez* into the validity of admitting the transcript of the conversation between Petitioner and his parents while Petitioner was in custody and retain a DVD expert to testify that Petitioner did not admit to using cocaine; and

(6) Trial counsel's cumulative errors deprived Petitioner of a fair trial.

(DE 1; DE 1-2).

## III.   <u>PRELIMINARY MATTERS</u>

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). "AEDPA requires that a state prisoner seeking habeas relief under Section 2254 must bring his federal petition within a year from the date that his state conviction becomes 'final,' either by the conclusion of his direct review or the expiration of time to seek such review." *Jones v. Sec'y, Fla. Dep't of Corr.*, 906 F.3d 1339, 1342 (11th Cir. 2018) (citing 28 U.S.C. § 2244(d)(1)(A); *Carey v. Saffold*, 536 U.S. 214, 216 (2002)). "This one-year statute of limitations will be tolled, however, for '[t]he time during which a properly filed application for State post-conviction or other collateral review' is pending in the state court." *Id.* (quoting 28 U.S.C. § 2244(d)(2)).

In addition, "the habeas statute requires applicants to exhaust all available state law remedies." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007) (citing 28 U.S.C.

§ 2254(b)(1)(A)).  AEDPA's limitation period and tolling provision, along with the habeas

statute's exhaustion requirement work together to "encourage litigants first to exhaust all state

remedies and then to file their federal habeas petitions as soon as possible." *Lawrence v. Fla.*, 549

U.S. 327, 332–33 (2007) (citations and internal quotation marks omitted).  Thus, before proceeding

to analyze Petitioner's claims on the merits, I address the issues of timeliness and exhaustion.

### A.  Timeliness

As to the timeliness of the Petition, Respondent states, without waiver of any defenses, that

the Petition appears to be timely filed.  (DE 13 at 4).  I agree that the Petition is timely filed for the

reasons set forth below.  The time limits for filing an application for habeas relief from a state

conviction are set forth in 28 U.S.C. § 2244(d), which provides as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

   (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

   (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

   (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

   (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).  Thus, "AEDPA's statute of limitations begins to run when the judgment pursuant to which the petitioner is in custody, which is based on both the conviction and the sentence the petitioner is serving, is final." *Vaughan v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 554, 555 (11th Cir. 2019) (per curiam) (quoting *Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1285, 1293 (11th Cir. 2007)).  When a petitioner is resentenced, the statute of limitations does not run until the date the resentencing judgment becomes final.  *See Hepburn v. Moore*, 215 F.3d 1208, 1209 (11th Cir. 2000).  Tolling applies, however, during the time in which "a properly filed application for State post-conviction or other collateral review" of the judgment is pending.  28 U.S.C. § 2244(d)(2).

Here, because Petitioner did not appeal from the resentencing judgment on November 14, 2013, his judgment became final upon expiration of the thirty-day appeal period from the judgment.  *See* Fla. R. App. P. 9.110(b).  Petitioner then filed a Rule 3.850 motion for postconviction relief on July 23, 2014.  (DE 14-2 at 140-59).  A total of 221[6] days of untolled time elapsed from the date that Petitioner's judgment and sentence became final on December 14, 2013, until he filed his postconviction motion to start the tolling of the one-year limitations period.  The one-year limitations period remained tolled until September 13, 2019, when the Fourth DCA issued its Mandate affirming denial of the postconviction motion.  (DE 14-2 at 231).  *See Nix*, 393 F.3d at 1237 (stating that "[t]he one-year limitations period . . . is tolled while an 'application for State post-conviction or other collateral review' is pending" (quoting 28 U.S.C. § 2244(d)(2))).

An additional fifty-five (55) days of untolled time elapsed between September 13, 2019 (when the Fourth DCA issued its Mandate)  and November 7, 2019 (when Petitioner filed the

---

[6] Petitioner stated that he "filed a motion for postconviction relief 252 days later in July 23, 2014." (DE 1-2 at 22).  The Petition failed to count the 30-day appeal period before the judgment became final.  However, this error does not affect the determination of timeliness.

instant Petition).  Adding the fifty-five (55) days to the prior calculation of 221 days of untolled time brings the total untolled time to 276 days.  Therefore, Petitioner filed his Petition within the one-year period allowed by statute.  Respondent also stipulated that the instant petition is timely. (DE 13 at 4).  Accordingly, I find that the Petition is timely filed.

### B.  Exhaustion

"Before bringing a habeas action in federal court, [a] petitioner must exhaust all state court remedies that are available for challenging his conviction." *Nieves v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 520 (11th Cir. 2019) (citing 28 U.S.C. § 2254(b), (c)).  "A failure to exhaust occurs . . . when a petitioner has not fairly presented every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1284 (11th Cir. 2012) (citation and internal quotation marks omitted).  "'In Florida, exhaustion usually requires not only the filing of a [Fla. R. Crim. P.] 3.850 motion, but an appeal from its denial.'" *Nieves*, 770 F. App'x at 521 (quoting *Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979)).

Here, Petitioner raises six grounds for relief.  His first two claims – that a portion of a DVD recording available to the jury during deliberations amounted to an unconstitutional comment on his invocation of his right to remain silent and that the trial court erred in denying his motion to suppress statements made to his parents which were recorded by law enforcement – were raised on direct appeal in his initial brief.  (DE 14-1 at 119, 121-135).  The remaining four grounds were raised in Petitioner's 3.850 motion.  (DE 14-2 at 140-59).  The summary denial of those claims was challenged on appeal.  (*Id.* at 182).  Thus, all of Petitioner's claims are exhausted.  Respondent stipulates that Petitioner has exhausted all claims in state court.  (DE 13 at 5).  Accordingly, I conclude that Petitioner exhausted his claims.

IV.   **LEGAL STANDARDS**

A.   **Standard Under the Antiterrorism and Effective Death Penalty Act**

As amended by AEDPA, title 28 U.S.C. § 2254(a) permits a federal court to issue "a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" if that custody is "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A deferential standard applies, however, to federal courts' review of petitions for habeas relief due to "the State's interest in the finality of convictions that have survived direct review within the state court system" and based upon principles of "comity and federalism."  *See Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) ("Federal intrusions into state criminal trials frustrate both the States' sovereign power . . . and their good-faith attempts to honor constitutional rights.").

Indeed, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Burt v. Titlow*, 571 U.S. 12, 19 (2013).  Relevant limitations on habeas relief are set forth in § 2254(d), which states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A federal habeas court's review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Furthermore, a state court may "adjudicate on the merits" without issuing a formal opinion

or outlining its reasoning. *See Harrington*, 562 U.S. at 99. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* Furthermore, when a state court does not include any reasons for the denial of a collateral attack, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

The "contrary to" prong of § 2254(d)(1) means that a state court decision "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite] result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (O'Connor, J.). In other words, "the state court's decision must be substantially different from the relevant [Supreme Court] precedent." *Id.*

Under the "unreasonable application" prong of § 2254(d)(1), a state court decision involves an unreasonable application of Supreme Court precedent if: (1) "the state court identifies the correct governing legal rule from [Supreme] Court[ ] cases but unreasonably applies it to the facts of the particular state prisoner's case"; or, (2) "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. "The focus of the . . . inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "[A] federal habeas court may not issue

the writ simply because [the] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.  Error correction is the function of state-level appeals; whereas "federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice system." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation and internal quotation marks omitted).  Thus, "[i]n order to satisfy [the 'unreasonable application' prong's] high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (citation and internal quotation marks omitted).

Under 28 U.S.C. § 2254(d)(2), a federal court may grant habeas relief when the state court's determination of the facts was unreasonable "in light of the evidence presented in the State court proceeding." "'[A] determination of a factual issue made by a State court shall be presumed to be correct,' and the prisoner bears 'the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Jenkins v. Comm'r, Alabama Dep't of Corr.*, 963 F.3d 1248, 1264 (11th Cir. 2020) (quoting 28 U.S.C. § 2254(e)(1)).  *But see Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("We have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)).").

As with § 2254(d)(1), a federal habeas court "accord[s] the state trial court substantial deference [for claims brought under § 2254(d)(2)]." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015).  Therefore, "the 'unreasonable determination of the facts' prong does not permit habeas relief 'merely because [the habeas court] would have reached a different conclusion in the first instance' or if 'reasonable minds reviewing the record might disagree about the finding in question.'" *Smith v. Sec'y, Dep't of Corr.*, 800 F. App'x 776, 779–80 (11th Cir. 2020) (quoting *Brumfield*, 576 U.S. at 313-14 (cleaned up)).  For a federal court to grant relief under § 2254(d)(2), as with

25

§ 2254(d)(1), "the state court's [factual] determination must be 'objectively unreasonable.'" *Landers*, 776 F.3d at 1294 (citing *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).  Objectively unreasonable means more than "merely wrong; even clear error will not suffice." *Tharpe v. Warden*, 834 F.3d 1323, 1338 (11th Cir. 2016), *cert. den'd*, 137 S. Ct. 2298 (2017) (citations and internal quotation marks omitted).  Therefore, even if the state postconviction court makes a factual error, its decision should be affirmed if there is some alternative basis sufficient to support it. *See Pineda v. Warden*, 802 F.3d 1198 (11th Cir. 2015).

In sum, "AEDPA's requirements reflect a presumption that state courts know and follow the law." *Woods*, 575 U.S. at 316 (citation and internal quotation marks omitted).  Therefore, "[w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.*  Indeed, section 2254(d)'s "highly deferential standard for evaluating state-court rulings . . . demands that state-court decisions be given the benefit of the doubt.'" *Cullen*, 563 U.S. at 181.  "This is especially true for claims of ineffective assistance of counsel . . . in order to afford both the state and the defense attorney the benefit of the doubt." *Woods*, 575 U.S. at 316-17.

## B.  Ineffective Assistance of Counsel

While AEDPA's substantial deference applies to all issues raised in the instant Petition, an additional layer of deference applies to claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668.   *See Cullen*, 563 U.S. at 190 (citing *Strickland* and stating that review was "doubly deferential" as it required a "highly deferential look at counsel's performance through the deferential lens of § 2254(d)") (citations and internal quotation marks omitted).  The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the

assistance of counsel during criminal proceedings against them.  *See Strickland*, 466 U.S. at 684-85.  "[D]efendants in state court prosecutions have such right under the Fourteenth Amendment."  *Minton v. Sec'y Dep't of Corrs.*, 271 F. App'x 916, 917 (11th Cir. 2008).   The Constitution, however, "does not guarantee the right to perfect counsel; it promises only the right to effective assistance."  *Burt*, 571 U.S. 12, 24 (2013).   When assessing counsel's performance under *Strickland*, the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate: (1) that his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; and (2) that he suffered prejudice as a result of that deficient performance.  *See id.* at 687-88.  To establish deficient performance, a petitioner must show that, "in light of all the circumstances, [counsel's performance was] outside the wide range of professionally competent assistance."  *Id.* at 690; *see Cummings v. Sec'y for Dep't of Corrs.*, 588 F.3d 1331, 1356 (11th Cir. 2009) ("To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place.").  A court's review of performance should focus "not [on] what is possible or what is prudent or appropriate, but only [on] what is constitutionally compelled."  *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*), *cert. den'd*, 531 U.S. 1204 (2001) (citation and internal quotation marks omitted).  There are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions.  *See id.* at 1317.  "Thus, no absolute duty exists to investigate particular facts or a certain line of defense."  *Id.*  The

test for ineffectiveness is not whether counsel could have done more or whether the best criminal defense attorneys might have done more. *See id.* at 1316 n.12. Instead, to overcome the presumption that assistance was adequate, "a petitioner must 'establish that no competent counsel would have taken the action that his counsel did take.'" *Hittson v. GDCP Warden*, 759 F.3d 1210, 1263 (11th Cir. 2014) (quoting *Chandler*, 218 F.3d at 1315).

To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs. *See id.* at 697. Further, counsel is not ineffective for failing to raise non-meritorious issues. *See Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001). Counsel is also not required to present every non-frivolous argument. *Dell v. United States*, 710 F.3d 1267, 1282 (11th Cir. 2013).

On habeas review, "under th[e] doubly deferential standard [applicable to ineffective assistance of counsel claims], the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1126 (11th Cir. 2012) (citation and internal quotation marks omitted). "[I]f, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of *Strickland* was not unreasonable and [section 2254(d)] precludes the grant of habeas relief." *Id.* (internal citation omitted); *but see Evans v. Sec'y, Dep't of Corrs.*, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (*en banc*) (Jordan, J., concurring) (explaining that double deference to a state court's adjudication of a *Strickland* claim applies only to *Strickland*'s performance prong, not to

the prejudice inquiry). This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson v. Sec'y, D.O.C.*, 643 F.3d 907, 911 (11th Cir. 2011).

## V.  **DISCUSSION**

### A.  **Claims**

Petitioner has not carried his burden to demonstrate that he is entitled to relief on any of his claims for the reasons set forth below.

#### 1.  **Claim 1: DVD recording and invocation of rights**

At trial, State's exhibit 44 was a DVD containing the video recording of Petitioner in BSO's interview room, including his interactions with Detectives Carmody and Ilarraza and his conversation with his parents.  Prior to trial, defense counsel moved to exclude evidence of Petitioner's invocation of his rights to remain silent and to counsel, including that portion of the video recording showing his invocation.  (DE 14-1 at 42-43).  The trial court granted that motion and prohibited the State from showing that portion of the recording wherein Petitioner invoked his rights.  (DE 14-1 at 45-46; DE 15-1 at 2).  The trial court similarly prohibited Dr. Butts from referring to Petitioner's invocation of rights in explaining her conclusions about Petitioner's sanity. (DE 15-2 at 1373-1379).  Because various expert witnesses had relied on other portions of the recording in formulating their opinions of Petitioner's mental state, the parties agreed that the State would edit out the portion showing the advisement and invocation of rights, while other portions of the recording would remain.  (DE 15-1 at 4-5).

Prior to trial, the State believed it had redacted out the portion of the recording pertaining to Petitioner's rights (*see* DE 15-2 at 963), and the trial court even provided a break for both the

prosecutor and defense counsel to verify that that portion had been excised before the recording was played. (*Id*. at 987). Indeed, in the initial part of the recording, the time from 4:35 a.m. to 4:40 a.m. (based on the analog clock visible in the background) had been edited out, excising all discussion of Petitioner's rights and his invocation of those rights. (DE 15-4 at 16). Thus, when the recording was played in court, it skipped from discussion of Petitioner's former telemarketing job to the detectives leaving the room and then later Petitioner asking for water and to use the bathroom. (DE 15-2 at 992; DE 15-4 at 18; *Davis*, 121 So. 3d at 482-83). However, when the recording reached 5:13 a.m., the recording jumped back and began re-showing events beginning at 4:25 a.m. (DE 15-2 at 1011). This apparently took the prosecutor by surprise, and he fast-forwarded the recording to 5:55 a.m., allowing it to play from there. (*Id*. at 1011-12). During jury deliberations, the jurors requested to view the entire DVD (*Id*. at 1685, 1702), and the DVD was sent back to the jury room.

During the appellate process, it was discovered that after the DVD skipped back to 4:25 p.m. and began replaying from there, the recording still contained the beginning of the portion at 4:35 a.m. that had previously been redacted out. (DE 15-4 at 16). The portion of the exhibit at issue is transcribed below:

DET. ILARRAZA: Davis

RALSTON DAVIS: (Unintelligible).

DET. CARMODY: Do you want to sit over here?

DET. ILARRAZA: Yeah -- before we go on to talking about what happened tonight, I have to go over your rights. You know what your rights are, right, under the law?

RALSTON DAVIS: Remain silent?

DET. ILARRAZA: Well, yeah. Let me go over them and then you can decide what you

want to do, okay, it will be up to you.

DET. CARMODY: That's it.

(DE 15-3 at 50).

Following this exchange, the DVD freezes and then jumps forward to 4:40 a.m., again

showing the detectives leaving the room.  (DE 15-4 at 18).  Although the portion at issue was not

played in open court, it was on the DVD that was later sent back to the jury during deliberations

upon request.  (DE 15-4 at 26; DE 1 at 26-27; DE 13 at 25).  The DVD was later fully transcribed

by a court reporter.  (DE 15-4 at 26; DE 15-3).

The Florida Supreme Court found that this chain of events did not amount to a comment

on Petitioner's invocation of rights that required reversal, noting that the recording did not show

the actual reading and invocation of Petitioner's rights and that neither the prosecution nor any

witnesses further commented on Petitioner's invocation.  *Davis*, 121 So.3d at 484.  Petitioner

argues that the finding that the recording did not show him invoking his right to remain silent was

an unreasonable determination of the facts because of his statement "remain silent."  Petitioner

further argues that the Florida Supreme Court's conclusion was contrary to established Federal

law because it considered whether the recording was "fairly susceptible of being interpreted as a

comment on Davis's silence" (following Florida's standard from *State v. Diguilio*, 491 So. 2d 1129

(Fla. 1986)) rather than applying the standard of whether "the statement was of such a character

that a jury would naturally and necessarily take it to be a comment on the failure of the accused to

testify"  from  *United States v. Knowles*, 66 F.3d 1146 (11th Cir.1995).  (DE 1-2 at 30).  Finally,

Petitioner argues that the Florida Supreme Court's decision amounts to an unreasonable

application of the "naturally and necessarily" standard.  (DE 1-2 at 29-30).  However, Petitioner

has failed to show that the state court's determination involved an unreasonable application of clearly established federal law or involved an unreasonable determination of the facts.

First, Petitioner fails to show that the state court made an unreasonable determination of fact in concluding that Petitioner's "remain silent" remark was not an invocation of his rights. His argument on this point focuses on what he asserts was the state court's erroneous determination that Petitioner was asking a question ("remain silent?") as opposed to making a statement ("remain silent"). (DE 1-2 at 29-30; DE 19 at 1-2). Petitioner asserts that his remark had "little if any inflection." (DE 1-2 at 29). This part of Petitioner's argument fails for two reasons. First, regarding the inflection (or alleged lack thereof) in Petitioner's "remain silent" remark, it is telling that a neutral court reporter who later transcribed the DVD placed the question mark at the end. The fact that the court reporter believed the question mark to be accurate indicates that it was not unreasonable for the state court to similarly conclude that Petitioner was asking a question or expressing uncertainty. But the issue of inflection is ultimately beside the point. Indeed, the state court did not discuss or seemingly rely on the determination that Petitioner's remark had the inflection of a question. Rather, the more important fact is that, when viewed in context, Petitioner's remark was in response to the detective's question of whether Petitioner knew what his rights were. *See* (DE 15-3 at 50). Viewed in this context, the state court reasonably concluded that Petitioner was simply answering the question and demonstrating some understanding of what his rights were before hearing a formal recitation of those rights rather than invoking and asserting his right to remain silent. Petitioner's remark in this context was certainly not the kind of "unambiguous" and "unequivocal" statement made "'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement *to be* a request' to exercise his right to remain silent and terminate the interrogation." *See Owen v. Florida Dept. of Corrections*, 686

F.3d 1181, 1194 (11th Cir. 2012) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)); *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010).   Therefore, the state court did not unreasonably determine that the recording did not show Petitioner invoking his right to remain silent.

Nevertheless, Petitioner argues that what the recording does show – the detective telling Petitioner that he would go over Petitioner's rights (with a reference to the right to remain silent), followed by the detectives leaving the room five minutes later (based on the wall clock visible on the video) – telegraphed to the jury that Petitioner had invoked his right to remain silent.  Petitioner argues that allowing the jury to (potentially) view this portion of the recording amounted to an impermissible comment on Petitioner's decision to remain silent.  However, Petitioner fails to show that the Florida Supreme Court's conclusion that the recording did not amount to a comment on Petitioner's silence requiring reversal was contrary to clearly established Federal law or an unreasonable application of such law.

Petitioner's "contrary to clearly established Federal law" argument is premised on the Florida Supreme Court's application of Florida's "fairly susceptible" standard rather than the Eleventh Circuit's "naturally and necessarily" standard.   This argument fails.  At the outset, it is notable that Florida's "fairly susceptible" standard is more favorable to Petitioner, and more likely to determine something to be a comment on silence, than the Eleventh Circuit's more stringent "naturally and necessarily" standard.  *See DiGuilio*, 491 So.2d at 1135 ("In Florida, we have adopted a <u>very liberal rule</u> for determining whether a comment constitutes a comment on silence: any comment which is 'fairly susceptible' of being interpreted as a comment on silence will be treated as such.") (emphasis added).  "Fairly susceptible" treats remarks as comments on silence if they are merely arguably so.  *Id*. at 1136.  By contrast "naturally and <u>necessarily</u>" suggests the

need for much more certainty.  Thus, it is difficult to conclude that Petitioner is entitled to habeas relief because the Florida court failed to apply a standard less favorable to Petitioner.  *See Early v. Packer*, 537 U.S. 3, 8 (2002).

More importantly, Petitioner fails to show how the Florida Supreme Court's decision contradicts clearly established Federal law *as established by the Supreme Court of the United States*.  For habeas relief to be granted, AEDPA requires that the state court's decision be contrary to Federal law "clearly established" by the United States Supreme Court, not a circuit court of appeals.  28 U.S.C. § 2254(d)(1); *Lopez v. Smith*, 574 U.S. 1, 5-7 (2014).  As Respondent correctly points out (DE 13 at 28), and as Petitioner concedes (DE 19 at 2), *Knowles* is an Eleventh Circuit decision, and the standard articulated in *Knowles* has not been adopted by the Supreme Court of the United States.

Nor does Petitioner demonstrate how the Florida Supreme Court's decision was contrary to, or an unreasonable application of, any U.S. Supreme Court decision more generally addressing comments on a defendant's post-*Miranda* silence.  It is clear that the prosecution may not use or comment on a defendant's post-arrest silence for impeachment, as evidence of guilt, or as evidence of a defendant's mental condition.  *See Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986); *Doyle v. Ohio*, 426 U.S. 610, 618 (1976); *United States v. Hale*, 422 U.S. 171, 180 (1975).  But Petitioner cites no standard established by the U.S. Supreme Court used to evaluate whether evidence that might imply – but does not explicitly state or show – a defendant's decision to remain silent constitutes such a use of or comment on that decision.  It is therefore difficult to conclude that the Florida Supreme Court's analysis of this question amounts to an unreasonable application of clearly established federal law.  It is also significantly less clear whether the relatively unique circumstances in this case amount to such a "comment" or "use" of Petitioner's silence,

particularly when the prosecution did not present, ask about, argue about, or refer to Petitioner's silence or the brief exchange mistakenly left on the DVD.

Finally, even if the state court erred in allowing the DVD to be viewed by the jury, such error would still be deemed harmless under the current standard of review set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  This standard requires a petitioner to show that error resulted in "actual prejudice" by demonstrating that the error "had a substantial and injurious effect or influence in determining the jury's verdict."  *Id*.  *See also Fry v. Pliler*, 551 U.S. 112 (2007). Petitioner argues that the alleged error was not harmless because "the jury **could have** grounded its rejection of Petitioner's insanity defense on the common-sense view that someone who invoked his constitutional rights could not have been insane."  (DE 1-2 at 27) (emphasis added).  Petitioner also avers that because the prosecutor repeatedly asked the jury to review the DVD carefully and the jury had the DVD for nearly a whole day, "it cannot be said beyond a reasonable doubt that it did not affect the verdict."  (DE 1-2 at 27-28).    However, in so arguing, Petitioner points to the wrong standard – the "harmless beyond a reasonable doubt" standard from *Chapman v. California*, 386 U.S. 18 (1967).  *See also* (DE 19 at 2).  The proper standard is the one from *Brecht*.

Here, as noted by Respondent, Petitioner failed to show "actual prejudice" with any supporting evidence that (1) the prosecution referred to the portion of the DVD in question, (2) jury viewed the portion of DVD, and (3) that the viewing influenced jury's decision.[7] (DE 13 at 29).  Petitioner's argument that the inference potentially drawn from less than a minute of unreferenced video substantially contributed to the jury's decision on Petitioner's sanity is particularly unavailing given the otherwise extensive testimony and evidence presented to the jury

---

[7] Note that the DVD was over five hours in total length and many other portions of the DVD were heavily debated during trial.

on the issue of sanity.  *See Brecht*, 507 U.S. at 639 (noting references to post-*Miranda* silence comprised less than two pages of a 900-page trial transcript).

Therefore, for all the foregoing reasons, Petitioner's Claim 1 provides no grounds for relief.

### 2.  Claim 2: Recorded conversation with parents

In Petitioner's Claim 2, he alleges that the state court committed constitutional error in denying the motion to suppress the recording of his conversation with his parents at the police station.  (DE 1-2 at 30-32).  Over an hour and a half after Petitioner invoked his right to remain silent and his right to counsel, Det. Carmody brought Petitioner's parents into the interview room at the police station.  (*Id*. at 31).  Det. Carmody told Petitioner's parents he was going to close the door and "Just knock if you want me, Okay?"  (DE 15-3 at 55).  According to the Petitioner, the police violated his Fourth Amendment right to be free from unreasonable searches and seizures because they fostered (and then violated) an expectation of privacy, citing *Katz v. United States*, 389 U.S. 347, 352 (1967).[8]  Petitioner claims that Det. Carmody created this expectation of privacy by closing the door and suggesting, since they needed to knock to get the detective's attention, that the conversation would be private.  Petitioner argues that the Florida Supreme Court's conclusion that Petitioner lacked a reasonable expectation of privacy amounted to an unreasonable application of *Katz*.  Petitioner further argues that failing to suppress the recording of the conversation was harmful because "[t]he recording served as a centerpiece for the State to argue his psychosis was drug-induced."  *Id*.

---

[8] Petitioner also suggests that the police circumvented his assertion of his Fifth Amendment right to remain silent and Sixth Amendment right to counsel by turning his parents into unwitting state agents.  (DE 1-2 at 31-32).  Yet Petitioner fails to cite or analyze any cases addressing the Fifth or Sixth Amendments, such as *Massiah v. United States*, 377 U.S. 201 (1964) and its progeny.  Therefore, I consider only Petitioner's asserted Fourth Amendment claim.

I find that this claim is insufficient to merit relief.  First, although Petitioner claims the Florida Supreme Court's decision that Petitioner lacked a reasonable expectation of privacy was "contrary to" clearly established Federal law, (DE 1-2 at 32), he does not point to any U.S. Supreme Court case that arrives at an opposite conclusion or "confronts facts that are materially indistinguishable" and "arrives at [an opposite] result."  *See Williams*, 529 U.S. at 405.  Again, the only U.S. Supreme Court decision he references is *Katz*.  Therefore, Petitioner at best can only argue that the Florida Supreme Court unreasonably applied the standard articulated in *Katz*.  *See id.* at 407.  However, Petitioner cannot show that the Florida Supreme Court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods*, 575 U.S. at 316.

As a background principle, "[t]he expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope.'" *Maryland v. King*, 569 U.S. 435 (2013) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)); *see also Hudson v. Palmer*, 468 U.S. 517, 528 (1984) (finding a prisoner has no reasonable expectation of privacy in a prison cell); *United States v. McKinnon*, 985 F.2d 525, 528 (11th Cir. 1993) (finding no reasonable expectation of privacy for pre- or post-arrest conversations in the back of a police car); *United States v. Duncan*, 598 F.2d 839, 852 (4th Cir. 1979) (noting "a societal decision that one may not reasonably expect his utterances to be private while he is being held in police custody for violation of the law").  Indeed, several courts, applying *Katz*, have determined that an individual under arrest did not have an objectively reasonable expectation of privacy in a police interrogation room such that the surreptitious recording of the arrestee's conversations with others in that room violated the Fourth Amendment.  *See*, *e.g.*, *United States v. Delibro*, 347 F. App'x. 474 (11th Cir. 2009); *United States v. Swift*, 623 F.3d 618, 623 (8th Cir. 2010); *Deegan v. Rudman*, No. 3:10–cv–00016, 2011 WL

251226, at *3–4 (W.D.Va. Jan. 26, 2011) (citing *Katz* and *Duncan*, 598 F.2d at n. 7).  In short, it was not unreasonable for the Florida Supreme Court to start from the premise that Petitioner lacked a reasonable expectation of privacy in the interview room to begin with.  Indeed, Petitioner does not seem to argue otherwise.

Starting with this background, the Florida Supreme Court had to determine whether the detectives' specific actions here fostered a reasonable expectation of privacy in an interview room where ordinarily there would be none.  As the Florida Supreme Court's decision in this case illustrates, this is a fact-intensive inquiry that can depend, for example, on what specific representations were made to the arrestee.  *See Davis*, 121 So. 3d at 486-487 (comparing *State v. Calhoun*, 479 So. 2d 241 (Fla. 4th DCA 1985), *Cox v. State*, 26 So. 3d 666 (Fla. 4th DCA 2010), and *State v. Munn*, 56 S.W.3d 486 (Tenn. 2001), with *Johnson v. State*, 730 So. 2d 368 (Fla. 5th DCA 1999) and *Williams v. State*, 982 So. 2d 1190, 1194 (Fla. 4th DCA 2008)).  Here, the Florida Supreme Court distinguished between cases where a defendant had asked to speak to someone "privately" (*Calhoun*) or had been affirmatively told by police that a conversation would not be watched or recorded (*Cox*) and cases where no such representations or assurances were made and the defendant was left alone or with family in the interview room.  (*Williams* and *Johnson*).  *Id*. This was a reasonable distinction to make.  Ultimately, the Florida Supreme Court determined that the implicit signals of closing the door and telling Petitioner and his parents to "knock if you want me" did not sufficiently foster an objectively reasonable expectation of privacy where one would otherwise not exist.  While the inferences one might draw from these actions might create an expectation of privacy in most circumstances, it was not unreasonable for the Florida Supreme Court to conclude that those same inferences do not apply in the specific context of an arrestee in police custody.

Whether the Florida Supreme Court may have reasonably decided differently, or whether this Court might have assessed the particular facts presented here differently, is not the question. Particularly, given the background principle of an arrestee's reduced expectation of privacy, and the varied factual scenarios that have led to differing outcomes, I cannot find that the Florida Supreme Court's application of *Katz* to this particular set of facts was unreasonable.

The fact that Petitioner only points to one counter-veiling decision – *Gennusa v. Shoar*, 879 F. Supp. 2d 1337, 1342 (M.D. Fla. 2012), *aff'd sub nom. Gennusa v. Canova*, 748 F.3d 1103 (11th Cir. 2014) – only underscores the fact that the Florida Supreme Court's decision here was not unreasonable.   Moreover, as Respondent argues, *Gennusa* is distinguishable in two key respects: (1) it involved an individual who was not in custody, whereas Petitioner was clearly in police custody, and (2) it involved invasion of the attorney-client privilege, whereas no such privilege existed here.   Indeed, the Eleventh Circuit's decision affirming *Gennusa* relied heavily on both of these factors.   It pointed to the fact that Gennusa's client (Studivant) was not arrested or in custody to distinguish from the cases discussed above describing a reduced or extinguished expectation of privacy.   *Gennusa*, 748 F.3d at 1111-12.   Moreover, it cited the attorney-client privilege, "the oldest of privileges for confidential communications known to the common law," as a strong source of an expectation of privacy that society has recognized as reasonable.   *Id*. at 1110-11 (internal citations omitted).   The fact that the communications implicated the long and clearly recognized attorney-client privilege gave the *Gennusa* court additional grounds to distinguish that case from others involving recording of conversations of people in custody.   *See id*. at n. 5 (citing *Lanza v. New York*, 370 U.S. 139, 143–44 (1962) and *United States v. Harrelson*, 754 F.2d 1153, 1169–70 (5th Cir.1985)).   Here, Petitioner asserts that the intimacy of the parent-child relationship should raise the reasonability of a subjective and objective expectation of

39

privacy.  However, there is no such recognized legal privilege, and Petitioner cites no authority suggesting that such a relationship affects what expectations of privacy society is willing to consider reasonable.  It is also telling that similar relationships had no apparent impact on other court decisions.  *See*, *e.g.*, *Delibro*, 347 F. App'x 474 (conversation between defendant and his mother); *Harrelson*, 754 F.2d at 1168-69 (conversations with wife and brother).  Ultimately, the decision in *Gennusa* at best suggests that a court may reasonably have come to a different decision than the Florida Supreme Court's decision here.  However, it does not demonstrate that the Florida Supreme Court's application of *Katz* was unreasonable.  Therefore, claim 2 does not merit relief.

### 3.   Claim 3: Failure to argue an effective motion in limine

As an initial matter, in Claims 3 to 6, Petitioner argues Ineffective Assistance of Counsel ("IAC") during his trial for various reasons and that the state court's finding that trial counsel did not provide ineffective assistance of counsel was contrary to or involved an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  (DE 1-2 at 32).

In Claim 3, Petitioner alleges IAC because the trial counsel failed to prepare, investigate, and argue an effective motion in limine or effectively advocate on his behalf.  (*Id*. at 33-34). Specifically, Petitioner alleges that because trial counsel failed to argue an effective motion in limine about Petitioner's refusal of invasive medical treatments, the prosecution was able to introduce his refusal of blood draw at the hospital and the cocaine found in his car into evidence. Petitioner contends that this prevented him from raising the issue on direct appeal and allowed the State to present its theory that Petitioner's psychosis was drug-induced, and ultimately convinced the jury of this theory.  (DE 1-2 at 35-38).

For context, Petitioner's trial counsel moved in limine to exclude evidence of the cocaine found in Petitioner's car, arguing that since he was not charged with possession of cocaine, evidence of the cocaine would be irrelevant and unduly prejudicial.  (DE 14-1 at 12-13).  The State responded with a memorandum of law, arguing the cocaine was relevant to support its theory of voluntary intoxication to counter Petitioner's insanity defense.  (*Id*. at 15-23).  Trial counsel then filed an answer, arguing that since no evidence existed to show that Petitioner ingested cocaine, the mere possession of the cocaine was neither inextricably intertwined with the charged murders nor sufficiently probative to outweigh any unfair prejudice to Petitioner.  (*Id*. at 34-38).  The trial court denied the motion in limine, holding that the cocaine found in Petitioner's car was relevant to both rebut his insanity defense and to his state of mind when refusing blood draw at the hospital.  (*Id*. at 40).  The trial court addressed trial counsel's answer by stating that the lack of conclusive evidence of ingestion went to the weight instead of admissibility of the evidence and that the evidence's probative value was not substantially outweighed by the danger of unfair prejudice.  *Id*.

Petitioner raised an identical claim of ineffective assistance of counsel in his motion for post-conviction relief.  (DE 14-2 at 147-153).  The State's response asserted that: (1) trial counsel properly preserved the admissibility of the cocaine for appellate review (and thus this issue should have been raised on direct appeal); (2) Petitioner's claim that the motion in limine would have been granted had trial counsel made the proposed additional arguments was speculative; and (3) the fact that Petitioner disagreed with trial counsel's strategy was not grounds for relief.  (*Id*. at 162).  The post-conviction court rested on the State's response and summarily denied Petitioner's claim.  (*Id*. at 166-168).

To prevail on an IAC claim, Petitioner must show that counsel's performance was deficient, such that counsel's errors were "so serious that counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment," and the deficient performance must be so serious as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, as described above, on *habeas* review "under th[e] doubly deferential standard [applicable to ineffective assistance of counsel claims], the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Morris*, 677 F.3d at 1126 (citation and internal quotation marks omitted). Here, applying the highly deferential standard as laid out in *Strickland*, I find the trial counsel did not perform so deficiently that he deprived Petitioner of a fair trial, much less that the state court was unreasonable in so finding. As stated above, trial counsel filed a detailed motion to exclude the cocaine and made a valid argument to the court about its lack of relevance. While Petitioner now suggests that the motion failed to address Petitioner's denial of medical services to explain the lack of a blood draw, there was no cause for such argument until the State's response framed the possession of cocaine (and the possibility of its ingestion) as a rebuttal to Petitioner's insanity defense. In answering that response, trial counsel <u>did</u> address Petitioner's refusal of all medical treatment, rather than specifically refusing a blood withdrawal for toxicology (DE 14-1 at n. 1) and argued the lack of evidence that Petitioner had ingested cocaine. Contrary to Petitioner's claim that trial counsel "missed the point" of the State's argument, trial counsel's focus on the lack of evidence of ingestion was a very reasonable argument against the State's position – emphasizing the inferential leap that the State would be asking jurors to make. The fact that trial counsel did not persuade the trial court with this argument does not mean that the manner in which he made it was constitutionally deficient. Moreover, I agree with the State (as the state court did) that Petitioner has not shown a reasonable probability that his imagined more-fulsome motion in limine argument would have changed the ruling of the trial court (which saw the dispute over ingestion as an issue

of weight to be argued to the jury).  Petitioner's claim of prejudice is, as the State argues, speculative.  Accordingly, Petitioner's Claim 3 provides no grounds for relief, because the state court did not unreasonably apply *Strickland*.

### 4.   Claim 4: Motion for judgment of acquittal

Petitioner contends that trial counsel was ineffective because he failed to make a particularized request for judgment of acquittal.  (DE 1-2 at 41).  At the end of the State's case in chief, trial counsel moved for judgment of acquittal on the ground that the State failed to meet the burden to prove that Petitioner shot the victims.  (DE 15-2, at 1131-32).  The court denied the motion.  (*Id*. at 1132).  Trial counsel then renewed his motion for judgment of acquittal on the same basis at the end of Petitioner's case in chief, which was denied again by the court.  (*Id*. at 1366-67).  The motion did not mention Petitioner's insanity defense.  (DE 15-2 at 1131-32).  Petitioner argues that

> if trial counsel had provided the trial court an opportunity to properly evaluate whether the jury had been presented clear and convincing evidence of Petitioner's insanity at the time of the alleged offenses, it would have held that Petitioner succeeded in this respect. Additionally, if the Florida Supreme Court had been provided the opportunity to evaluate a proper motion for judgment of acquittal, it would have found Petitioner entitled to an acquittal based on the insanity defense.

(DE 1-2 at 42).  The state court rejected this claim, finding that Petitioner could not show prejudice because he could not show that his hypothesized motion for judgment of acquittal would be granted.  (DE 14-2 at 167-168).  More specifically, the state court found that there was sufficient evidence from which the jury could conclude that Petitioner was not insane, and, therefore, judgment of acquittal would not have been proper.  *Id*.

The state court reasonably applied *Strickland*'s prejudice standard.  A judgment of acquittal is only appropriate if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.  *See Barwick v. State*, 660 So. 2d 685, 694 (Fla. 1995);

*Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974).  Therefore, the trial judge must first determine if there is competent evidence from which the jury could infer guilt to the exclusion of all other inferences.  *Id*. at 694.  The same is true even in the context of an insanity defense, with the court deciding whether there was sufficient evidence from which the jury could find against the defendant on the issue of insanity.  *See Butler v. State*, 891 So. 2d 1185 (Fla. 4th DCA 2005).  After the judge determines, as a matter of law, whether such competent evidence exists, then the "question of whether the evidence is inconsistent with any other reasonable inference is a question of fact for the jury." *Long v. State*, 689 So. 2d 1055, 1058 (Fla. 1997).  On review, the court must view the conflicting evidence in a light most favorable to the state.  *Peterka v. State*, 640 So. 2d 59, 68 (Fla. 1994).  So long as competent, substantial evidence supports the jury's verdict, it will not be overturned on appeal.  *Id*.

Here, the state court correctly determined that Petitioner cannot show prejudice from counsel's alleged failure to move for acquittal based on an insanity defense.[9]  There was at least competent, substantial evidence sufficient to allow the jury to decide the issue of insanity.  At trial, the State offered substantial evidence to support the theory that Petitioner's psychosis was caused by voluntary intoxication to rebut Petitioner's insanity defense.  This evidence included, *inter alia*, the cocaine seized from Petitioner's car at the time of arrest, lay witness testimony that Petitioner used other narcotics (DE 15-2 at 1349), a police officer's testimony that Petitioner's behavior and symptoms were consistent with narcotics usage, (*Id*. at 853-54, 1229, 1630), and expert opinion that Petitioner's psychosis could have been caused by narcotics and that he might have been

---

[9] Because Petitioner cannot establish prejudice, the Court need not consider whether counsel provided constitutionally deficient performance.  *See Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (stating that "the court need not address the performance prong if the defendant cannot meet the prejudice prong . . . or vice versa"); *Evans v. State*, 946 So. 2d 1, 12 (Fla. 2006) (same).

malingering.  (*Id*. 2153-81).  A jury was entitled to weigh this evidence and make credibility assessments of both Petitioner's experts and the State's expert in considering the issue of insanity. *Cf. Joseph v. State*, 65 So. 3d 587 (Fla. 4th DCA 2011).[10]  Thus, even if trial counsel had moved for a judgment of acquittal on the ground of insanity defense as Petitioner has suggested, Petitioner cannot prove that it would have been granted.  The fact that Petitioner presented contradictory evidence at trial does not necessarily mandate reversal because the jury is not required to believe his version of the facts where the State has produced conflicting evidence.  *See Spencer v. State*, 645 So. 2d 377, 381 (Fla. 1994).  Therefore, Petitioner's Claim 4 provides no grounds for relief.[11]

### 5.  **Claim 5: Transcript**

Petitioner also claims the postconviction court improperly denied his claim of IAC on the grounds that trial counsel (1) failed to move for an inquiry pursuant to *Martinez v. State*[12] into the validity of admitting the transcript of the conversation between Petitioner and his parents while

---

[10] Petitioner attempts to distinguish *Joseph* by arguing that Dr. Butts's testimony (that Petitioner's behavior "could have been consistent with the use of cocaine, ecstasy, or amphetamines") was equivocal.  Petitioner's argument is unavailing.  Petitioner ignores the other evidence in the record that the jury could consider in conjunction with Dr. Butts's testimony.  Moreover, even considering Dr. Butts's less-than-definitive language, I cannot conclude that such language would have compelled the trial court to find that no reasonable jury could have found against Petitioner on the issue of insanity.  Nor can I find that the state court that denied this claim for ineffective assistance of counsel was unreasonable in similarly finding.

[11] Petitioner asserts that (in addition to being "contrary to and [an] unreasonable application of clearly established federal law") the state court's decision was "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  (DE 1-2 at 46).  He also complains about the state court's decision to deny this claim without an evidentiary hearing.  *Id*. at 44.  Yet Petitioner does not articulate what facts the state court unreasonably found or what factual disputes an evidentiary hearing would elucidate.  This claim involves what arguments trial counsel could or should have made based on the evidence presented at trial and whether the trial court would have granted a motion for acquittal based on that record.  The record of what evidence was presented at trial is clear, and the propriety of a judgment of acquittal on that record is a question of law, not fact.  Therefore, the state court did not err in failing to hold an evidentiary hearing.  For the same reason, no evidentiary hearing is warranted here.

[12] 761 So. 2d 1074 (Fla. 2000).

Petitioner was in custody and (2) failed retain a DVD expert[13] to testify that Petitioner did not admit to using cocaine.  (DE 1-2 at 46-49).  Petitioner argues that if trial counsel properly challenged the admissibility of the transcript or retained an expert to provide his own version of the transcript, there would have been no dispute as to whether he admitted to using cocaine. (DE 1-2 at 47-48).

Trial counsel objected to the transcript of the DVD being used by the jury as an aid while the DVD was played, asserting that he could not verify its accuracy.  (DE 15-2 at 893).  The trial court allowed the State to authenticate the transcript through voir dire of Det. Ilarraza, who testified that during the recording, he was in and out of the room, and was in a monitoring room watching the interview when he was not in the room.  Det. Ilarraza testified that he verified the accuracy of the transcript by comparing it against the DVD and made corrections.  (*Id*. at 895-896).  He also testified that he had no special training or expertise in transcription and marked words he could not understand as "unintelligible."  (*Id*. at 897-900).  The trial court held the detective did not need any particular expertise and properly authenticated the transcript.  (*Id*. at 901).  The trial court instructed the jury that the transcript was merely an aid, that the DVD recording was the primary evidence, and that it was for the jurors themselves to decide whether the transcript correctly reflected the recording.  (*Id*. at 938-39).  During the playing of the DVD, trial counsel objected that some jurors were simply reading the transcript instead of watching the video.  (*Id*. at 982).  The trial court overruled the objection but reinstructed the jury to use the transcript as an aid only.  (*Id*. at 986).  At one point, a juror noticed a page was missing; the trial court then instructed the

---

[13] From the context of Petitioner's argument, it appears he intends "DVD expert" to mean someone with expertise in translating Jamaican Patois into English, not someone with technical knowledge about DVD recordings.

bailiff to collect the transcripts and told the jurors to watch the video instead.  (*Id*. at 1070).  The transcript was not sent back for deliberations.  (*Id*. at 1075).

A portion of the DVD contained an exchange between Petitioner and his parents related to the ingestion of cocaine and the possibility of death if tasered during its use. (DE 15-3 at 73-74). Petitioner contends that this portion of the transcript had poor audio quality and that the Petitioner was speaking in a form of Creole/English known as Jamaican Patois, making it difficult for a layperson to understand what was said.  As transcribed by the State, Petitioner appeared to speculate that the police may have tased him "'cause I have cocaine in my system."  *Id*. at 74. Petitioner's mother testified that Petitioner had not admitted to using drugs in this conversation but rather was referring to others using cocaine.  *Davis*, 121 So. 3d at 491.  On direct appeal, Petitioner contended that he had actually said "*they* have cocaine in *their* system" (contrasting himself – who survived tasing – with others who had used cocaine and did not survive).  *Id*.

On direct appeal, the Florida Supreme Court found that the trial court had abused its discretion by failing to follow the instructions of *Martinez*, which requires either a stipulation by the parties that a transcript is accurate or for a trial court to make an independent pretrial determination of the accuracy of the transcript based on testimony from persons who can testify to its accuracy.  *See Martinez v. State*, 761 So. 2d 1074, 1086 (Fla. 2000).  To testify to the accuracy of a transcript one must either have participated in the conversation or listened to or overheard the conversation as it was being recorded (if the quality of the conversation they listened to was better than the recording).  *Id*.  Because Det. Ilarraza was not in the room at all times and there was no testimony that the quality of what he overheard was better than the recording, the Florida Supreme Court held he could only authenticate the portions of the conversation in which he was an actual participant.  Therefore, it found that the trial court abused its discretion in allowing the whole

transcript to be used as a demonstrative aid. *Davis*, 121 So. 3d at 491.  However, the Florida Supreme Court then held the error was harmless. *Id*.  The Supreme Court noted that the only inaccuracy Petitioner raised on appeal (and the only one he points to here) was regarding the above-quoted statement about using cocaine.  That court further observed that the pertinent portion of the transcript was heavily disputed at trial, including with testimony from Petitioner's mother contradicting the State's transcription. *Id*.  That court also noted that: the jury was not provided the transcript during deliberations; the jury asked for and viewed the DVD during deliberations; and the trial court instructed the jury to rely on the video, not the transcript.  (*Id.* at 492).  Thus, the Florida Supreme Court held the erroneous admission of the transcript did not affect the ability of the jury to resolve the disputed portion of the recording. *Id*.

Armed with the Florida Supreme Court's finding that the trial court erred in admitting the transcript, Petitioner raised his IAC claim in his motion for postconviction relief.  (DE 14-2 at 156-57).  Specifically, he claimed trial counsel provided ineffective assistance because he failed to move for a proper inquiry under *Martinez* at trial and failed to retain a defense expert to analyze Petitioner's conversation with his parents on the recording.  (DE 14-2 at 156).  The postconviction court denied the claim finding that Petitioner could not demonstrate prejudice as the Florida Supreme Court opined that the error in admitting the transcript was harmless.  (DE 14-2 at 168-69).  It also noted that Petitioner could not "couch a claim decided adversely to him on direct appeal in terms of ineffective assistance of counsel in an attempt to circumvent the rule that postconviction may not serve as a second appeal."  (DE 14-2 at 168 (citing *Pietri v. State*, 885 So.

48

2d 245, 256 (Fla. 2004)).[14]   Finally, it noted that Petitioner's claim was speculative because it assumed that an additional expert would have analyzed the transcript properly. (DE 14-2 at 169).

The state postconviction court's application of *Strickland*, concluding that Petitioner had not demonstrated either ineffective performance or prejudice, was reasonable.  As to the failure to adequately seek a *Martinez* inquiry, Petitioner cannot demonstrate prejudice for all of the reasons the Florida Supreme Court found that admission of the transcript was harmless error.  Even without the transcript, the jury still would have heard conflicting interpretations and arguments over what Petitioner had said and ultimately would have been directed to rely on what they heard on the recording – just as the trial court instructed them to do anyway.

Petitioner's argument regarding the supposed failure to hire an expert is also unavailing for several reasons.  Petitioner argues that had trial counsel retained an expert, the expert would have been able to interpret Petitioner's statement regarding cocaine use in the way Petitioner suggests, the expert would have been allowed to testify to this interpretation, and this testimony would have left "no dispute at trial" as to whether Petitioner admitted to using cocaine.  Petitioner's belief that an expert would have provided the interpretation he wanted is speculative, particularly in light of Petitioner's own assertion that the audio quality of the recording was poor.  Petitioner also fails to explain why an expert would be allowed to create, and testify to, a competing transcript when that expert have suffered from the same deficiencies under *Martinez* as Detective Ilarraza.  The expert would not have been an actual participant in the conversation nor someone who heard the conversation at better quality than on the recording.  *See Davis*, 121 So. 3d at 490 (quoting *Martinez*, 761 So.2d at 1086).  Therefore, it is not likely that an expert would have been allowed

---

[14] The court noted that Petitioner only raised one issue regarding an inaccuracy in the transcript on direct appeal. (DE 14-2 at 169).

to offer his own interpretation of Petitioner's statement.  Moreover, the state postconviction court reasonably pointed to the fact that trial counsel <u>did</u> contest the issue of Petitioner's statement through a witness with firsthand knowledge of the conversation and familiarity with both Petitioner's voice and Patois – Petitioner's mother.  Therefore, it was not unreasonable for the state post-conviction court to determine that trial counsel's performance was constitutionally permissible where trial counsel chose not to retain an expert who may not have been allowed to testify and would have (at best) bolstered another witness's testimony.

For similar reasons, Petitioner cannot demonstrate prejudice.  Petitioner's assertion that retention of an expert (in combination to seeking exclusion of the State's transcript) would have left "no dispute" over Petitioner's statement about use of cocaine is incorrect.  As the state court found, the issue was "heavily contested" at trial, and, as Respondent argues, it would have remained heavily contested had Petitioner offered an expert's competing interpretation of the recording.  Ultimately, the trial court still would have instructed the jury to make its own assessment of the recording.  Thus, the postconviction court's ruling that Petitioner failed to demonstrate prejudice under *Strickland* was reasonable and claim 5 does not merit relief.

### 6.  <u>Claim 6: Cumulative error</u>

Petitioner's Claim 6 is for cumulative error.  (DE 1-2 at 49).  Because his Claims 1 to 5 were all rejected as discussed above, Petitioner's Claim 6 is also rejected.  *See Morris v. Sec'y, Dept. of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) (stating that cumulative error claims fail "in light of the absence of any individual errors to accumulate").

### B.  <u>Evidentiary Hearing</u>

"[I]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which,

if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  Here, Petitioner requests an evidentiary hearing, in the alternative, for claims three, four, and five.  (DE 1-2 at 41, 46, 49).

Petitioner has the burden to establish the need for an evidentiary hearing.  *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011).  "[T]he district court need not conduct an evidentiary hearing if the record refutes the petitioner's factual allegations, otherwise prevents habeas relief, or conclusively demonstrates that the petitioner was not denied effective assistance of counsel." *Martinez v. Sec'y, Fla. Dep't of Corr.*, 684 F. App'x 915, 926 (11th Cir. 2017) (citing *Schriro*, 550 U.S. at 474).  A petitioner's conclusory allegations fail to demonstrate that an evidentiary hearing is warranted.  *See Chavez*, 647 F.3d at 1061.

Furthermore, the deferential standards of habeas review under § 2254 apply in determining whether an evidentiary hearing is appropriate.  *See Schriro*, 550 U.S. at 474 ("If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.").  Thus, "before a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record." *Landers v. Warden, Atty. Gen. of Ala.*, 776 F.3d 1288, 1295 (11th Cir. 2015).

Here, Petitioner fails to carry his burden.  Specifically, Petitioner fails to demonstrate the existence of any basis to warrant a federal evidentiary hearing.  Rather, Petitioner's claims are all resolvable based upon the state court record without the need to develop the record further.  Therefore, I find that an evidentiary hearing is unnecessary and decline to hold one.

### C.  Certificate of Appealability

A habeas petitioner seeking to appeal a district court's final order denying his or her petition for writ of habeas corpus has no absolute entitlement to appeal and must obtain a certificate of appealability to do so.  *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180, 183 (2009). The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, when a district court has rejected a petitioner's claims on a procedural basis, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Upon consideration of the record, the Court should deny a certificate of appealability, because reasonable jurists would not find the assessment of the constitutional claims debatable or wrong.  Notwithstanding, if Petitioner does not agree, Petitioner may bring this argument to the attention of the District Judge in objections to this Report.

## VI.  CONCLUSION

For the foregoing reasons, I respectfully **RECOMMEND** that the Petition for Writ of Habeas Corpus (DE 1: DE 1-2) be **DENIED** and that no certificate of appealability be issued.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz II, United States District Judge.  Failure to timely file objections shall bar the

parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

      **DONE AND SUBMITTED** in Fort Lauderdale, Florida on this 10th day of February 2022

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished via CM/ECF to:

Hon. Rodolfo A. Ruiz II
United States District Judge

Counsel of record